A. WELLINGTON PECK and JOHN FRANCIS PECK, as Executors, etc., of ALBERT L. PECK, Deceased, Appellants, v. MARY C. SMITH, Respondent.

Third Department, May 8, 1918.

Will construed — bequest and devise with right of life beneficiary to use part of principal as may be necessary and with power to sell real estate — when such will does not give life beneficiary power to transfer property so as to cut off remaindermen — scheme to avoid provisions of will and to deprive remaindermen of their interest.

A will which gave to the wife of the testator " the use " of a certain sum of money for life with the right and privilege to use such part or portion of the principal as to her shall seem meet and proper, together with a life interest in the income of real estate with the privilege to sell the same, should she deem it necessary, with a further proviso that if on the death of the wife there shall be left any part or portion of the bequest, or of the real estate or the proceeds thereof, they are bequeathed and devised equally to certain specified legatees, the testator did not intend an absolute gift of the personal property or realty, nor vest the life beneficiary with a power to dispose of them by will.

Hence, where in an action to recover portions of said properties transferred by the testator's widow during her lifetime to her sister, the defendant, it appears from all the evidence that the transfers were made with an attempt to evade the provisions of the will and to deprive the residuary legatees of their rights thereunder and that the widow was not acting in good faith, the transfers are without effect and the plaintiff is entitled to recover the property.

APPEAL by the plaintiffs, A. Wellington Peck and another, as executors, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Fulton on the 16th day of June, 1917, dismissing the complaint upon the decision of the court after a trial at the Fulton Trial Term before the court, a jury having been waived.

*Horton D. Wright*, for the appellants.

*Frank Talbot*, for the respondent.

JOHN M. KELLOGG, P. J.:

The question for determination is whether, under the will of Albert T. Peck, the transfer from his widow to her sister of the securities sought to be replevied is valid.

By the 2d item of the will he gave to his wife, Grace A. Peck, " the use of the sum of Twenty thousand dollars for and during the term of her natural life, with the right and privilege to use such part or portion of the principal thereof as to her shall seem meet and proper." By the 3d item of the will he gives to her " for and during the term of her natural life, the use, rents and income of " the Johnson House in Johnstown, N. Y., " with the right and privilege of selling the same if at any time she should deem it necessary, and the right and privilege to use such part or portion of the proceeds of the sale of said house, as to her shall seem meet and proper; and a conveyance by her of said house and lot to any person, shall be deemed to be an exercise of the right herein conferred upon her to sell and convey the same, and her conveyance thereof shall be valid and effectual forever."

The securities in question are a part of the $20,000 mentioned in the 2d item of the will.

The will also provided that if at the time of the death of Grace A. Peck " there shall be left any part or portion of the sum of Twenty thousand dollars given and bequeathed to my said wife in paragraph second of my said will, and the house and lot situated on North Perry street, or the proceeds thereof mentioned in paragraph Third of my said will, then I give, devise and bequeath said sums, and the said house and lot, or the proceeds thereof " equally to the legatees mentioned in the 25th item of the will, of whom the wife was one.

It is clear that the testator did not mean to give to his wife absolutely the $20,000 and the house and lot. She could not dispose of them by will or in a testamentary manner. (*Matter of Ithaca Trust Co.*, 220 N. Y. 437; *Matter*

*of Briggs,* 180 App. Div. 752; *Terry* v. *Rector, etc., St. Stephen's Church,* 79 id. 527.)

The transaction between the sisters took place August 23, 1913, at San Francisco, at the house where they had been living together for about a year prior thereto, and must be gathered substantially from the testimony of Mrs. Bradley and the instruments executed at the time. Both of the ladies were in apparent good health; Mrs. Peck was then about fifty-eight years of age and Mrs. Bradley about ten years o der. The Bradleys rented a rooming house, 855 Capp street, and sublet rooms, having four roomers aside from Mrs. Peck, and evidently had but little if any means aside from the $10,000 which it was claimed by Mrs. Bradley that Mrs. Peck had given her when she was in New York, and apparently that sum was the only money Mrs. Peck had aside from the benefit she derived under this will.

On August twenty-third Mrs. Bradley sent for a lawyer, selected by her to come and see Mrs. Peck, as she says, at the latter's request for the purpose of making her will. The will of Mr. Peck was produced, and the lawyer was asked his judgment upon it, and he had grave doubt whether Mrs. Peck could give away the $20,000, but thought she could otherwise dispose of it. Thereupon formal papers were executed, which need not here be particularly described other than a reference to their general nature. Mrs. Peck made a transfer of all of her property to her sister, Mrs. Bradley; also a deed of the Johnson house in Johnstown and an assignment of the two mortgages in litigation here; she also made her will giving to Mrs. Bradley all of her property. At the same time Mrs. Bradley executed her will, giving and devising to Mrs. Peck all the properties and moneys " which I have received or shall receive by gift, conveyance, assignment, bill of sale and purchase, or in any one or more of said manners or otherwise, from or through her, the said Grace A. Peck; and in the event that for any reason whatsoever it is impossible or impracticable to distribute, deliver and assure to her any one or more of the identical articles of said properties or effects so received, then unto said Grace A. Peck, I bequeath the value as of and at the time of my receipt thereof of each and every such article of said properties and effects, money

and credits to the extent realized upon to be returned hereunder to her, said Grace A. Peck, in money or money's worth from my estate."

At the same time Mrs. Bradley executed a paper whereby, in consideration of the transfers, deeds and assignments made by her sister of even date, she agreed as follows: " I  *  *  * do hereby undertake and agree to and with the said Grace A. Peck to comfortably support and maintain her (or afford her, from the properties so made or to be made over to me or from other sources if required, the necessary means to that end) so long as she shall live.  Also, to be a companion to her, give her all such personal and sisterly care, nursing and attention as she may desire or require and my circumstances permit and treat her as a member of my own family and in all respects with every due kindness and consideration, all while we both shall live."

The natural effect of these instruments, read together — and they were clearly one transaction — is that the property was to be used for the support of Mrs. Peck and that upon her death Mrs. Bradley was to become the owner of it, if she survived her sister; upon the other hand, if Mrs. Bradley died during the lifetime of Mrs. Peck the property was to become the property of Mrs. Peck.  In that case the transfers and the wills were of but little importance, unless possibly the attorney had in mind that Mrs. Peck, by receiving the property as a legatee and devisee of her sister, would receive it freed from the conditions and limitations of the husband's will and become the absolute owner of it.  It is evident that such a transaction cannot be upheld as an exercise of the power given to the widow by the Albert T. Peck will.

We can profitably mention certain facts which make plain the intention of the sisters, and make it clear that the transaction referred to was an attempt to evade the provisions of Albert T. Peck's will, and was not a reasonable exercise of the power given by it but was a studied effort to evade it and deprive the residuary legatees of the benefits Mr. Peck intended for them.

Mr. Peck died July 2, 1911.  In February, 1912, Mrs. Bradley came, without invitation, from California to Gloversville, N. Y., to see her sister, as she says, because she worried

about her. In April, 1912, the two sisters called upon one of the executors and the attorney of the estate at Gloversville, and asked the attorney to explain to Mrs. Bradley the conditions of the Peck will. She was informed that the widow had the use of the $20,000 and the house and lot so long as she lived, but if occasion required she could use some of the principal for her support, but otherwise she could not dispose of the property; that after she was through with it, it would be divided among the legatees mentioned in the will, but that the $10,000 which Mr. Peck had given to his wife before his death (which was represented by two certificates of deposit in the bank) she could dispose of as she wished. The sisters left for California in July, 1912. Mrs. Bradley swears that the $10,000 in certificates was given to her by her sister before they left, for the reason that the sister was so glad to see her. Mrs. Bradley furnished one room and an alcove for her sister, which had previously been rented for about $20 per month. They evidently lived in a very inexpensive way; they had no servant; Mrs. Bradley, her husband, Mrs. Peck and a part of the time Mrs. Bradley's son and wife lived together in the house, which Mrs. Peck bought and gave Mrs. Bradley. Mrs. Peck took with her all of her property when she went to California, evidently under the arrangement that she was to live with her sister. What took place when the papers were drawn August 23, 1913, we must gather from the nature of the transaction and the testimony of Mrs. Bradley. She pleads forgetfulness, and her attorney puts many words into her mouth, and he swears to conversations and conclusions evidently intended to sustain his work. In cross-examining Mrs. Bradley he asks her if she recalls that when he came to see her sister that the subject of the business was mentioned, and she says it was, and after another immaterial question and answer she says: " I know what the idea was, but I could not give it to you in words. The idea was that she wanted to talk to you about making her will. Q. Did she confine it to her will? A. I don't remember anything else." He then relates certain conversations as having taken place, to which she assents. He then asked: " Q. Do you recall you said during the talk we had that night that you wanted to put the money in some way so that while it might be

yours if you wanted it, you wanted to put it in some way so that Mrs. Peck would know what was done with it? A. Yes. Q. You arranged so that she could draw checks against it? A. Yes, most emphatically I do. Q. You spoke about the money paid for the house as being her money. Was it hers or yours at that time? A. I think it was mine. The money was transferred to this account and she drew the check. Q. That was pursuant to that arrangement, that you wanted her to know what was done with it? A. Yes. It was really my money. Q. Was there any understanding between you and Mrs. Peck that while it was put in your name it was not yours? A. Yes, she understood it was hers in this way only, so long as she was in her right mind I was not to use it in a way that she objected to, so she would feel sure of proper care. Q. Do you mean to say that it was her money? A. In a way we called it hers and we called it mine. Of course it was her money originally and it was to be mine at the time of her death, whatever there was, and I was to take care of her as long as she lived. I don't know what you want to get at."

On redirect examination she was asked: " When you say Mrs. Peck had spent all the money, you mean she had spent it in the ways indicated, by giving you an automobile and buying this property, 855 Capp Street. That is what you mean? A. Yes. Q. And yet it was understood between you and Mrs. Peck that she was to have the use of that money during her lifetime, and you were to have it completely on her death? A. But there was not any left. Q. But the understanding was that? A. Yes, in the way I have said before."

The attorney says that when Mrs. Bradley was to sign the paper he called in her husband and that he signed his consent. The husband was asked: " Do you recall substantially the substance of what you signed yourself? A. I should have no objection in any way, as the husband of my wife, to anything that transpired between her and Grace, Mrs. Peck. Q. That was relating to what? A. The will, or whatever was to be done between them. Q. Was it stated to you or not, substantially, what was being done between them? A. Making a will. Q. What do you mean by making a will? A. She was to — I don't know just how to get at that — but

the making of a will was being talked of, I suppose. I had never heard it talked of except in a general way. All I was interested in at that time was that I was not to interfere in any way with anything that should be done, as her husband."

When Mrs. Bradley was at Gloversville her husband wrote her, in reply to a letter he had received from her. He deplores the conditions of the Peck will, but makes it plain that in some way they must get the property freed from its provisions. Evidently this letter was not received by her, but it discredits the husband and makes it plain that he and his wife were keen to get the property away from Peck's beneficiaries, and indicates that he had full knowledge of the transaction of August twenty-third and probably was the instigator of it. Mrs. Bradley swears that the money was changed from Mrs. Peck's name to hers at the savings bank and that an account was opened in another bank in the name of both sisters, upon which either one checked. The bank books were not produced. When the house was bought for Mrs. Bradley as a gift from Mrs. Peck, the latter gave her check for the purchase price. Two thousand dollars is alleged to have been given by Mrs. Peck in the same manner to Mrs. Bradley's son, and an automobile was bought for Mrs. Bradley as a gift from Mrs. Peck and paid for by Mrs. Peck's check drawn in the same way. It is strange, if the moneys were Mrs. Bradley's, why the checks should be drawn by Mrs. Peck and the transactions treated as gifts from Mrs. Peck. When the house at Johnstown was sold, although it had been deeded to Mrs. Bradley, it was conveyed to the purchaser by Mrs. Peck.

It is quite evident from the entire case that when the sisters discovered at Gloversville that the $20,000 could not be given away but must be used for support, Mrs. Peck immediately divested herself of all of her own money, giving it to Mrs. Bradley, and moved with her property to Mrs. Bradley's residence in California. This was undoubtedly for the purpose of depriving Mrs. Peck of the means of support and making it necessary to use the principal of the estate, and the so-called gifts were evidently made for the purpose of dissipating the funds of the estate and turning them away

from the residuary legatees. Notwithstanding the transaction of August twenty-third, the sisters evidently considered that the property was Mrs. Peck's, and treated it as such, but that Mrs. Bradley, upon Mrs. Peck's death, should become the owner of what was left, but if Mrs. Bradley died first the property was to be the absolute property of Mrs. Peck. The transaction was not made in good faith for the real support and maintenance or personal use of Mrs. Peck, and the transfers were not for purposes which to her seemed meet and proper under her husband's will, but was a scheme contrived and executed so far as could be to take Mr. Peck's property away from his legatees and make it the absolute property of Mrs. Bradley or Mrs. Peck, or the survivor of them. As to the house and lot, Mrs. Peck had no right to sell it unless she should deem it necessary. The right to sell the house, being limited by her judgment as to the necessity of the sale, necessarily raises the inference that the testator had in mind some fact which might render the sale necessary and the use of the proceeds meet and proper. By giving away any of the proceeds remaining after her death, it is evident that he did not intend her to give it away for him, as he was making his own will. He must have had in mind the necessities of the widow and that a sale of the house might in some way be necessary for her personal needs, use or comfort. I think we may fairly conclude that the sale of the house and the use of its proceeds was limited substantially as the use of the principal was limited in the *Briggs* case.

The testator uses the words " meet and proper " with reference to the $20,000 legacy; we may also infer that he had in mind the necessity of such use the same as occurred to him with reference to the real estate, as it is not evident why he should draw any distinction between them. A reasonable construction of the gift to the widow of the $20,000 and house and lot is that she was to have the life use of them, with the right to dispose of them if necessary, in her judgment, for her use and benefit, in such a way as she should deem meet and proper. The exercise of the power called for good faith upon her part and a reasonable ground for saying that it was meet and proper and necessary for her to dispose of the principal. She was an executrix of the will, and while

she had this power of disposing of the principal, she nevertheless owed a certain duty to preserve the estate for the beneficiaries, and must exercise the judgment required of her, keeping in mind her duties towards the husband's beneficiaries. An honest judgment upon her part, resting upon some reasonable basis, was necessary. There was here no basis for any judgment upon her part. In fact the evidence and circumstances are conclusive that the alleged transfers were a mere scheme between her and her sister to deprive the husband's beneficiaries of the property and to vest it in the surviving sister. We conclude, therefore, that the attempted transfer is without effect. The question of a demand upon the defendant, considering the course of the trial, need not be considered. No such question was raised by the motion for nonsuit. (*Thayer* v. *Marsh*, 75 N. Y. 340; *Crapo* v. *City of Syracuse*, 183 id. 395; *Gerding* v. *Haskin*, 141 id. 514.)

The judgment should, therefore, be reversed upon the law and the facts, and judgment directed for the plaintiffs, with costs.

All concurred; H. T. Kellogg, J., not sitting.

Judgment reversed upon the law and facts, with costs, and judgment directed for the plaintiffs, with costs. The court disapproves of the fourth and sixth findings of fact, and makes the following additional findings of fact: By the transactions between Mrs. Peck and Mrs. Bradley, her sister, of which the alleged transfer of the securities in question is a part, it was the intention thereof that Mrs. Peck should have the use of said property during the lifetime of both sisters, and at the death of either of them that the survivor should become the absolute owner of said property. The transfer was not made for the use, comfort or benefit of Mrs. Peck, and in making it she did not deem such disposition of the property meet and proper, but did it in bad faith, and for the purpose of wrongfully taking the property of her husband away from his beneficiaries and making it the absolute property of herself and her sister; that said transfer was without consideration, and of no force, and that the plaintiffs are the owners and entitled to the immediate possession of said securities and the defendant wrongfully withholds them from the plaintiffs.